

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MRM
F. #2020R00123

*610 Federal Plaza*
*Central Islip, New York 11722*

April 9, 2020

<u>By ECF and Email</u>

Honorable Sandra J. Feuerstein
United States District Judge
United States District Court
Eastern District of New York
1010 Federal Plaza
Central Islip New York 11722

          Re:    <u>United States v. Amber Schatz</u>
                 <u>Criminal Docket No 20-48 (S-2) (SJF) (ARL)</u>

Dear Judge Feuerstein:

      The government respectfully submits this letter in response to the motion by defendant Amber Schatz, filed on April 8, 2020, in which she requests to be temporarily released from Bureau of Prisons, Metropolitan Detention Center ("MDC") custody during the pendency of the COVID-19 pandemic.[1]  For the reasons set forth below, the motion should be denied.

    I.    <u>The Defendant Is a Danger to the Community and a Risk of Flight</u>

      As an intitial matter, under the Bail Reform Act, the defendant is a danger to the community and poses a risk of flight if released. <u>See</u> 18 U.S.C. § 3142.

---

[1] Since the beginning of the COVID-19 pandemic, MDC has provided a list of over 500 inmates whose identified medical conditions made them potentially particularly susceptible to COVID-19.  The defendant was not included on the list, and the defendant has submitted no claim of increased susceptibility to COVID-19 in light of any specific medical condition.

A. Schatz's Criminal History

Schatz's criminal history consists of a single prior conviction, in Suffolk County, in which she pled guilty on November 6, 2008, to driving while impaired by drugs, a misdemeanor. However, as part of her sentence imposed for that conviction, Schatz was sentenced to 60 days' jail and placed on three years of probation. It is important to note that as a result of this conviction, Schatz pending drugged driving charges, from an earlier 2008 arrest, were dismissed as part of the plea.

During that probationary term, on February 7, 2011, Schatz was resentenced for a violation of her probation and was thereafter sentenced to a jail term of eight months. During the pendency of that case, bench warrants were issued for Schatz on two separate occasions.

The defendant's criminal history clearly demonstrates that she is a substantial danger to the community, as it is beyond dispute that drunk and/or drugged driving places the lives of average citizens at risk. These crimes, by the very nature, victimize people in the communities in which they are committed.

Similarly, the defendant's criminal history demonstrates that she is a risk of flight. Schatz has failed to appear in court as directed and has violated the terms of her probation. Schatz's history discloses that that the defendant cannot be expected to follow lawful orders, including the directives of pretrial release.[2]

---

[2] This Court should disregard the intitial recommendation of the United States Pretrial Services Agency. This is due, not because of any action or conclusion of the Pretrial Services Agency, but instead due to the fact that, at the initial appearance and bail hearing, Magistrate Judge Arlene R. Lindsay had found that both Prussick and Schatz had been misleading in their representations to the Pretrial Service's agency, specifically in regards to the information provided about their residences. Because the Pretrial Services Agency's report and recommendation were made prior to this misrepresentation being discovered, the Court should not rely on that original recommendation, which Judge Lindsay ultimately disagreed with, finding the defendant a risk of flight and danger to the community. See United States v. Prussick, et al., 20-CR-48 (SJF), ECF Doc. No. 16. Specifically, Judge Lindsay noted at the initial appearance that both defendants sought to mislead the court about their living arrangements. Schatz told the court she lived Mastic Beach with her family, while Prussick told the court that he resided in Rocky Point with Schatz. In reality, as both later admitted to the court, they were residing at 42 Lewin Drive in Wading River, where the drugs, gun and their personal property was found during the execution of a search warrants, infra. In fact, on December 2, 2019, Prussick and Schatz called in a complaint to law enforcement about a suspicious individual in the area and they both listed their address at that time as 42 Lewin Drive, Wading River, New York.

B. <u>The Instant Criminal Conduct</u>

The above-captioned indictment against Schatz charges her with conspiring to distribute cocaine base, commonly referred to as "crack cocaine," fentanyl, and cocaine. Specifically, it charges Schatz with conspiring to distribute in excess of 28 grams of cocaine base, in excess of 40 grams of fentanyl and a quantity of cocaine in or about January 2020, as well as possessing with the intent to distribute those same substances, in violation of 21 U.S.C. §§ 846, 841(a), 841(b)(1)(B) and 841(b)(1)(C). The defendant is also charged with the possession of a firearm in furtherance drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Because the defendant has been indicted for a narcotics-trafficking offense for which the maximum sentence is in excess of ten years and a violation of 18 U.S.C. § 924(c), there is a presumption that there are no conditions of release that can reasonably assure her appearance and the safety of the community. <u>See</u> 18 U.S.C. § 3142(e)(3). The defendant cannot rebut such a presumption—nor does she meaningfully attempt to—because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight. The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" <u>United States v. Millan</u>, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).[3]

Furthermore, given the seriousness of the charged offense, regardless of the defendant's dangerousness to the community, the defendant is facing significant sentencing

---

[3]   The government submits that home detention and electronic monitoring are not sufficient to ensure the safety of the community in this instance. Here, the defendants' residence was the location they used to conduct their narcotics processing activities. Under the Bail Reform Act, the Second Circuit views home detention and electronic monitoring as insufficient to protect the community against dangerous individuals:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

<u>Millan</u>, 4 F.3d at 1049 (internal citations and quotation marks omitted); <u>see also United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) (noting that "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"; rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring) (internal citations and quotation marks omitted).

3

exposure, which increases a person's likelihood to flee or fail to return to court as directed. Title 21, United States Code, Section 841(b)(1)(B)(iii) sets the statutory mandatory minimum for an individual conspiring to distribute 28 grams or more of cocaine base at 5 years' imprisonment and the statutory maximum at 40 years. Similarly, Title 21, United States Code, Section 841(b)(1)(B)(vi) sets the statutory mandatory minimum for an individual conspiring to distribute 40 grams or more of fentanyl at 5 years' imprisonment and the statutory maximum at 40 years. Title 18, United States Code, Section 924(c)(1)(A)(i) sets the statutory mandatory minimum for an individual possessing a firearm in furtherance of a narcotics trafficking crime at 5 years' imprisonment and the statutory maximum at life. A conviction for violating 924(c) must run consecutively to any other term of imprisonment imposed per Title 18, United States Code, Section 924(c)(1)(D)(ii). Accordingly, Schatz is facing between 10 years' and life imprisonment if convicted. The significance of the defendant's sentencing exposure weighs in favor of detention.. United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

The strength of the government's case, which the Court may consider pursuant to 18 U.S.C. § 3142(g)(2), is overwhelming as some of Schatz narcotics dealings were caught on video recordings and observed by police officers. The government also recovered video of Schatz and Prussick discussing the firearm that they possess and who purchased the weapon. Aside from the video recordings of Schatz narcotics dealing, the government's investigation also recovered large quantities of narcotics from Schatz and a purchaser during a buy and bust, as well as large quantities of narcotics from Schatz and Prussick's home. Specifically, on January 23, 2020, members of law enforcement conducting surveillance of Prussick and Schatz observed the defendants exit their residence and proceed directly to a public location in Shoreham, New York where together they engaged in a narcotics transaction with third party who was purchasing narcotics. Members of law enforcement disrupted the narcotics transaction in progress and ultimately recovered narcotics from Schatz and the purchaser. The money paid by the purchaser was also recovered from Prussick. Prussick, Schatz and the purchaser were all arrested and charged in Suffolk County. The narcotics recovered from Schatz and the purchaser were submitted for laboratory testing.

Following the arrest of Prussick and Schatz, members of law enforcement obtained, from Suffolk County Supreme Court, a search warrant for the defendants' Wading River residence. Upon the court authorizing the search warrant, members of law enforcement executed a search of the defendants' residence. During the execution of that search warrant, members of law enforcement uncovered large quantities of narcotics, narcotics processing materials, including scales, stoves (separate from the traditional home stove), narcotics packaging materials, cutting agents and a pill press, as well as a 9mm assault rifle and ammunition. These items were located throughout the residence occupied by the defendants. More specifically, narcotics and the assault rifle were located in the defendants' master bedroom. All of the narcotics recovered from the residence were submitted for laboratory testing.

The Suffolk County Police Department laboratory testing of the substances recovered from Prussick and Schatz residence, the substances recovered from Schatz and the substances recovered from the purchaser yielded the following results:

The Defendants' Residence
- 40.37 grams of cocaine base ("crack cocaine")
- 127.42 grams of cocaine
- 162.59 grams of fentanyl (including one pill containing fentanyl)
- 7.9 grams of oxycodone
- 1.03 grams of heroin

Amber Schatz
- 4.13 grams of cocaine (four of nine bags recovered were tested)
- 15.06 grams of fentanyl (separated into nineteen individual bags)
- 0.12 grams of fentanyl (one pills of 57 total pill recovered)

Purchaser
- 1.00 gram of cocaine
- 0.48 grams of fentanyl

Additionally, the government has interviewed multiple civilian witnesses who will be able to testify to their firsthand knowledge of Schatz and Prussick's narcotics trafficking activities, including activities related to at least one non-fatal overdose in Suffolk County.  In sum, the weight of the government's evidence against Schatz is overwhelming.

Schatz's suggestion that she be placed on home confinement and electronic monitoring is insufficient to protect the community and assuage the risk of flight.  Schatz is a drug dealer and there is nothing about home confinement that affects her ability to conduct a drug business.[4]  Schatz can have narcotics delivered to her and customers can come to her as well.  Indeed, most drug businesses are conducted over telephones with only limited, short in person meetings with buyers and suppliers.  Here, Schatz and Prussick conducted their business over the phone from their residence.  Therefore, it would require around the clock monitoring to ensure Schatz doesn't resume her trade, narcotics trafficking, as soon as she is released.  Furthermore, nothing about Schatz proposed conditions of release would prevent an attempt to flee the substantial prison term she is currently facing.  Were Schatz to decide to flee, it would require members of law enforcement to expose themselves to COVID-19 in an attempt to locate and apprehend her.

---

[4]  Indeed, Schatz has reported to Pretrial Services that she was a self-employed house cleaner, therefore, Schatz was unable to proffer any confirmable employment or income to the Pretrial Services Agency.  See United States v. Prussick, et al., 20-CR-48-002 (SJF), Pretrial Services Report, at 2.

C. <u>Other Relevant Conduct</u>

During the course of the investigation into narcotics trafficking by Prussick and Schatz, law enforcement located photographs of unmarked police cars, in a private police lot on Schatz's cellphone. Schatz's cellphone also had control of the video surveillance system that monitored the home where they stored their narcotics. Counter surveillance such as this is frequently done by careful narcotics traffickers. Furthermore, Schatz and Prussick were the subject of numerous community complaints, specifically, Crime Stoppers Tips, by concerned members of the community, are set forth in sum and substances, herein:

- On November 7, 2018, a civilian reported that Amber and her boyfriend were dealing opiates, including heroin and Suboxone in the area of Rocky Point. Reporting that drugs were sold in the car, people getting in and out of the car, just as law enforcement observed in this case.

- January 1, 2019, a Civilian tipster named Prussick and Schatz as drug dealers selling heroin, fentanyl, meth and oxy, stated that Schatz would keep the drugs on her person if stopped by law enforcement, which is exactly what happened here.

- On March 11, 2019, a civilian reports that his friend who was an opiates abuser was obtaining his drugs from Curtis Prussick.

- On March 25, 2019, a civilian reported that Amber and a male have been selling heroin and Suboxone to a neighbor of the civilian. Civilian also informed that they have reported Amber and the male in the past.

- In June 2019, a civilian reported that their friend had suffered a non-fatal overdose and that the civilian would frequently have to revive his friend, he reported that his friend was obtaining the drugs from Prussick and Schatz and has been getting heroin from them for a long time. Prussick would do deals in his BMW (which law enforcement located at the Wading River residence during the SW execution) and he would only handle the money, while Schatz would hold the drugs. This is exactly as what happened in the deals that law enforcement observed in this case.

In sum, the defendant's criminal history, her personal characteristics, current criminal charges and relevant dangerous prior conduct all serve to demonstrate, by clear and convincing evidence, that the defendant is a danger to the community and, by a preponderance of the evidence, that she is a severe risk of flight.

II. <u>Release Is Not Warranted Under the "Compelling Reason" Clause</u>

The defendant seeks pretrial release by claiming that she is at-risk for contracting COVID-19, a respiratory illness that can spread from person to person. The defendant seeks release under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a

6

United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. For example, the Honorable Jack B. Weinstein agreed to the release of Colombo family captain Gregory Scarpa when that defendant was terminally ill with AIDS, was not expected to live until trial, and his medical condition could not be managed appropriately by prison medical facilities. United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993). Even in those extreme circumstances, release was conditioned on the defendant being confined to a hospital under 24-hour guard of the United States Marshal Service, to be reimbursed by the defendant's family. Id. at 92. Here, the defendant makes no claim that she is in a particularly susceptible category of individuals.

According to a report received from the MDC on April 7, 2020, submitted in response to Eastern District of New York Chief Judge Roslynn R. Mauskopf's Administrative Order 2020-14, three of the seven MDC inmates tested for COVID-19 have tested positive.

The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended for 30 days, although confidential attorney calls are being provided. Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement: All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Inmates with exposure risk factors are quarantined. In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations: The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Moreover, based on a March 18, 2020 letter from the Metropolitan Correctional Center ("MCC") and MDC to the Honorable Colleen McMahon, Chief Judge for the United States District Court in the Southern District of New York, and an April 3, 2020 letter from the MCC and MDC to the Honorable Roslynn R. Mauskopf, Chief Judge for

the United States District Court in the Eastern District of New York, the government is aware of the following additional measures that the MDC has taken in light of COVID-19:

- Cleaning supplies are issued once a week. They are available on each housing unit, and staff have been instructed regarding whom to contact should additional supplies be necessary.

- Staff are screening each staff member who enters the facility, including temperature scans.

- Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells.

- Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

- Showers are available on a daily basis.

- Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and medical care.

Effective on April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:

- For a 14-day period, inmates in every BOP institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

- To the extent practicable, inmates will still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshal's Services, is working to significantly decrease incoming movement to all BOP facilities.

As these new measures demonstrate, the BOP is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.

Accordingly, a growing number of decisions in this district and the Southern District of New York have continued the detention of defendants with medical conditions comparable to the defendant. See, e.g., United States v. Marte, No. 19-CR-795 (SHS), 2020 U.S. Dist. LEXIS 56194, at *3-4 (S.D.N.Y. Mar. 30, 2020) (denying bond for a "long time smoker" defendant who was an "alleged leader of [an] oxycodone conspiracy," noting that

"the community in its entirety" is facing the pandemic); United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and family history and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Lipsky, No. 19-CR-203 (NGG), Mar. 24, 2020 Order (E.D.N.Y.) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 61-year old with asthma); United States v. Hamilton, No. 19-CR-54 (NGG) 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained at MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); United States v. Acosta, 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus); United States v. Terrill Latney, 18-CR-606 (S-2) (JS), ECF. No. 213 (E.D.N.Y. Apr. 2, 2020) (denying bail application for inmate detained in MDC on racketeering conviction who suffered from obesity and hypertension).

In sum, BOP is taking proper precautions and the defendant is not uniquely situated with respect to the risk of infection of COVID-19, and Schatz's personal circumstances do not overcome the significant danger and risk of flight she would pose if released. Accordingly, the defendant has not presented a "compelling reason" for her release under Section 3142(i).

III.    Conclusion

Based on the foregoing, and because the defendant poses a serious danger to the community and risk of flight, the permanent order of detention should remain in effect.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/ Michael R. Maffei
Michael R. Maffei
Assistant U.S. Attorney


cc:    Honorable Sandra J. Feuerstein, United States District Judge (by ECF and email)
Defendant's Counsel, LaKeytria Felder, Esq. (by ECF and email)
Clerk of Court (by ECF)